UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-61165-Civ-Cohn/Seltzer

JAMES K. FIANO,

        Plaintiff,

v.

MEDDIRECT, INC.,

        Defendant.

_____/

## DEFENDANT, MEDDIRECT, INC.'S MOTION FOR SUMMARY JUDGMENT WITH SUPPORTING MEMORANDUM OF LAW

COMES NOW, the Defendant, MEDDIRECT, INC. (hereinafter referred to as "MEDDIRECT"), by and through its undersigned attorneys and pursuant to Rule 56, Federal Rules of Civil Procedure, and Local Rule 7.5, and hereby requests entry of Summary Judgment in its favor and against Plaintiff, JAMES K. FIANO (hereinafter referred to as "Plaintiff"), and as grounds therefore states:

### Motion for Summary Judgment

1.    Plaintiff brought this action against Defendant, MEDDIRECT asserting violations of the federal Fair Debt Collection Practices Act ("FDCPA"); Florida's Consumer Collection Practices Act ("FCCPA"). **[Doc. 1]**

2.    Defendant denies all liability and damages as to the claims under the FDCPA and FCCPA which are currently alleged against it in Plaintiff's Complaint, and further maintains the claims raised by the Plaintiff have no merit.

Page **1** of **6**

3.     Defendant is entitled to summary judgment as a matter of law since Plaintiff's claims Defendant violated the FDCPA are not supported by the undisputed material facts. Defendant contends there is no genuine issue of material fact since the undisputed evidence before this court demonstrates that the Defendant is not a "debt collector" as that term is defined under the FDCPA since the alleged debt obligation was in default and thus Defendant is subject to the exclusion found in Section 803(6)(F)(iii)

4.     Defendant is further entitled to summary judgment as a matter of law under Section 559.72(7) Fla. Stat. since this Court has previously held that any alleged failure to comply with the federal "debt collector" disclosure does not constitute a violation of Section 559.72(7) Fla. Stat.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     The underlying debt which is the subject matter of this action arises out of medical services performed by Anesthesiology Consultants of the Palm Beaches, P.A.; billed by its agent Medac, Inc.; and referred to the Defendant Meddirect to perform billing services pursuant to the Master Services Agreement between the Parties. **[Ex. 1-Master Services Agreement]**

2.     The underlying account was not in default during the period of time that Meddirect, by and through its representatives, communicated with the Plaintiff. **[Ex. 2 and 3: Affidavits of Al Ott and Rick Snow]**

## MEMORANDUM OF LAW

### *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment *"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and*

*admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."* In order to prevail on a motion for summary judgment, the moving party must demonstrate that no genuine issue of material fact exists and that judgment as a matter of law should be granted in the moving party's favor. Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.1979). In considering a motion for summary judgment, the court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. Matshushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); SEC v. Blavin, 760 F.2d 706 (6th Cir.1985). Although the moving party has the burden of showing that no genuine issue of material fact exists, the non-moving party, however, may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claim and establishing the existence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The dispute must also be genuine. The facts must be such that, if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. Id. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

## ARGUMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMEMT

If an entity is attempting to collect a debt obligation which was not in default at the time the entity obtained the account, such billing efforts and communications are exempt under the Fair Debt Collection Practices Act ("FDCPA). Section 1692a(6)(F)(iii) clearly states that the term "debt collector" does not include (F) *"any person collecting or attempting to collect a debt owed or due or asserted to be owed or another to the extent that such activity. . .(iii) concerns a debt which was not in default at the time it was obtained by such person."* Although the FDCPA fails to define "default", the Federal Trade Commission generally holds that when a debt is considered to be in default is controlled by the terms and conditions of contract creating the debt and applicable state or federal law. See: deMayo, FTC Informal Staff Letter (May 23, 2002) *See also:* Hartman v. Meridian Fin. Servs, Inc., 191 F.Supp.2d 1031, 1036 (W.D. Wis. 2002); Azar v. Hayter, 874 F.Supp. 1314 (N.D. Fla. 1995);

In this case, the original creditor has presented undisputed evidence that at the time that the account balance was assigned to the Defendant, the account balance was not considered in default. "According to the affidavit of the original creditor, Medac, Inc., as agent for Anesthesiology Consultants of the Palm Beaches, the affiant, Rick Snow states that the account balance for the Plaintiff was assigned to the Defendant to conduct billing services and that the account was not in a defaulted status during the period of time that the Defendant was communicating with the Plaintiff. Similarly, the Defendant, by and through its representative, Al Ott, has testified that the Defendant performs "pre-default" billing services for the original creditor and therefore under this status, it was not required to comply with the debt collection disclosures required by the FDCPA during its communications with the Plaintiff.

Therefore, Defendant respectfully requests this court to grant its motion for summary judgment as there is no genuine issue of material fact that the account was in default at the time that the Defendant was communicating with the Plaintiff and thus the Defendant is not considered a "debt collector" as that term is defined by the FDCPA.

### FLORIDA'S CONSUMER COLLECTION PRACTICES ACT

Next, Defendant asserts that it is entitled to summary judgment as to Plaintiff's Count III pursuant to Section 559.72(7) Fla. Stat. Plaintiff merely asserts that the Defendant's alleged failure to disclose that it was a "debt collector" and the purpose of the communication was in violation of Florida statute by *"willfully engaging in conduct the natural consequence of which is to harass."* Contrary to Plaintiff's assertions, the Defendant is not legally obligated to identify itself as a debt collector under Florida law nor is it legally required to disclose the purpose of its communication unless *"when specifically requested by the debtor"* as required by Section 559.72(15) Fla. Stat. In fact, subsection (15) only requires the Defendant to adequately identify himself or his employer. Each of the alleged messages identified in Plaintiff's Paragraph 10 of the Complaint contain the name of the billing representative and some state that the call was from Meddirect. This jurisdiction has previously held that the Defendant is not liable under the FCCPA for failing to comply with the "debt collector" disclosure required by the FDCPA. As stated above, the Defendant is not a "debt collector" as that term is defined by the FDCPA and therefore, the Defendant is not legally required, in fact, may be legally prohibited, from disclosing that it was a "debt collector" during its communications with the Plaintiff.

Therefore, Defendant respectfully requests this court to grant its motion for summary judgment as there is no genuine issue of material fact that the Defendant was required to disclose it was a "debt collector" during its communications with the Plaintiff as it was not required to as

it is exempt under the FDCPA as it is not a "debt collector" as that term is defined by the FDCPA and was not required to make such a disclosure under Section 559.72(15) Fla. Stat. as there is no evidence that such compliance with this section, causes a violation of Section 559.72(7) Fla. Stat.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed on March 19, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which Notice will be electronically mailed to DONALD A. YARBROUGH, ESQUIRE, (donyarbrough@mindspring.com), Post Office Box 11842, Fort Lauderdale, Florida 33339.

**s/ Ernest H. Kohlmyer, III**
Ernest H. Kohlmyer, III, Esquire
Florida Bar No. 0110108
SOUTH MILHAUSEN, P.A.
Gateway Center
1000 Legion Place, Suite 1200
Orlando, Florida   32801
(407) 539-1638
(407) 539-2679 (fax)
skohlmyer@southmilhausen.com
Attorneys for Defendant

Medac, Inc.

and

MedDirect, Inc.

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is made and entered into this 31st day of October, 2008 by and between Medac Inc. a Georgia Corporation ("Medac") and MedDirect, Inc., a Michigan corporation (individually referred to as "MedDirect," collectively referred to with as the "Parties").

WHEREAS, Medac, in cooperation with MedDirect, desires to enter into a business arrangement whereby MedDirect agrees to provide management and support services to all Medac customers in billing, servicing, accounting for and managing Patient Balances (as this term is defined below) in connection with claims generated by each participating individual Medac customer.

NOW, THEREFORE, the Parties agree as follows:

SECTION 1 – GENERAL TERMS AND CONDITIONS

A.    Definitions.

1.    Patient Balance.  Patient Balance shall mean the portion of a discrete claim for which a patient or a guarantor is responsible, as opposed to a Third Party Payor.  The term "Patient Balance" shall include Self Pay Patient Balances, and Post Insurance Patient Balances.

2.    Post Insurance Patient Balance.  Post Insurance Patient Balance shall mean that portion of a subject claim that is determined to be a Patient Balance subsequent to its submission to Third Party Payor for payment.

3.    Self Pay Patient Balance.  Self Pay Patient Balance shall mean that portion of a subject claim that is determined to be a Patient Balance prior to the attending claim's submission to a Third Party Payor for payment.

4.    Third Party Payor.  Third Party Payor shall mean a party, other than the patient or a guarantor that is responsible for paying in whole or in part a subject claim.

5.    Group.  Group shall mean any medical practice currently using the billing services of Medac.

6.    Electronic Submission.  Electronic submission shall mean the transfer of electronic data via an agreed upon standard electronic data interchange (EDI) format.

7.    Claims.  Claims shall mean a request from a Group that a Patient Balance and/or Post Insurance Patient Balance account needs payment and account servicing.

B.    Term.

1.    Term of Agreement.  This Agreement shall commence on the Effective Date and shall remain in effect for two years.

2.    Termination.  Either party may immediately terminate this Agreement and any Services Schedule: (a) if the other party fails to perform its material obligations under this Agreement, and such failure is not corrected within thirty (30) days after receipt of written notice of the same or (b) upon ninety (90) days prior written notice to the other party, with or without cause.

3.    Effect of Termination.  Upon termination of this Agreement for any reason, all rights granted both Parties shall terminate, and both Parties shall immediately discontinue use of all products and services authorized under this Agreement, and pay all outstanding amounts due hereunder.  In addition, both parties shall promptly return all data, drawings, diagrams, designs, documents, software, specifications, input formats, manuals, hardware and materials supplied by both Parties.

C.    Confidentiality.

1.    Definition.  For purposes of this Agreement, "Confidential Information" shall mean any data or information disclosed by one party to the other in connection with this Agreement that is not generally known to the public, and is clearly identified as confidential or, by its nature, should reasonably be considered confidential, including, but not limited to: (a) the terms and conditions of this Agreement (excluding the existence of this Agreement); (b) information about product plans, marketing strategies, finance, operations, customer relationships, customer profiles, customer lists, sales estimates or financial performance of either party; (c) any computer software or computer database (including the software, embedded software, documentation or any portion thereof), including the source code or object code thereof, and

any specifications, data, reports, formulae, data models, data formats, field or record layouts, or improvements related thereto; and (d) any individually identifiable medical or financial information. Confidential information shall not include information that: (w) is or becomes a part of the public domain through no fault of the receiving party; (x) was lawfully received by the receiving party from a third party free of any obligation of confidence; (y) was already in the lawful possession of the receiving party prior to receipt from the disclosing party; or (z) the receiving party can show by a preponderance of documentary evidence was subsequently and independently developed by its employees, consultants or agents without reference to the Confidential information of the disclosing party.

2.     Confidentiality Obligations. Each party acknowledges that the Confidential information of the other party is proprietary and confidential and may contain valuable trade secrets. Each party shall hold the Confidential information of the other in confidence and protect the same with at least the same degree of care with which it protects its own most sensitive confidential information, but in any event no less than reasonable care. Each party shall use the Confidential information of the other solely in connection with the exercise of its rights, and the performance of its obligations, under this Agreement and shall restrict disclosure of and access to the Confidential information of the other party to its employees who require access to such Confidential information in connection with this Agreement. Each party shall require its employees to comply with the obligations of confidentiality set forth herein and shall be liable for any employee's failure to so comply. If a receiving party is required by judicial, administrative or other governmental order to disclose any Confidential information of the other party, it shall notify the other party within 72 hours prior to making any such legally required disclosure in a timely manner and provide reasonable cooperation in order to allow such party to seek a protective order or other appropriate remedy. Provided such notification is given, the receiving party is hereby authorized to comply with such judicial, administrative or governmental order.

3.     Ownership. All Confidential information shall remain the property of the disclosing party providing the Confidential information. Nothing in this Agreement is intended to grant any rights in or to the Confidential information of the other party except as expressly set forth herein. All Confidential information shall be returned to the disclosing party upon written request or termination of this Agreement.

4.     Equitable Relief. In the event of a breach by a party of Sections C.2. or C.3., the non-breaching party may not have an adequate remedy solely in money damages and any such breach will cause the non-breaching party irreparable harm. In the event of such breach, the non-breaching party shall be entitled, without the requirement of posting a bond or other security, to seek equitable relief, including an injunction or specific performance.

D.   Proprietary Information.

1.     Proprietary Rights. With the exception of the limited use rights expressly granted in this Agreement, both Parties reserve any and all right, ownership, title, and interest in its own services and materials (collectively "Partner IP"), and both parties shall treat information property as the property of other party. This Agreement does not affect any transfer of title in any Partner IP. Both parties acknowledge and agree that the information, and all intellectual property rights (including, without limitation, copyright, patent, trade secrets, confidential information rights, and moral rights) derived or devolving from the Partner IP, and all derivative works of the Partner IP, and such intellectual property rights (including, without limitation, data compilations, abstracts, aggregations and statistical summaries), and all information regarding the foregoing (including but not limited to technology and know-how information) and all copies of the foregoing, regardless of by whom prepared, are owned by and are valuable, special and unique assets of each Party. Both Parties further expressly acknowledge and agree that the foregoing are the confidential property and trade secrets of the each Party and "Confidential information" of each Party subject to Section C above, whether or not any portion thereof is or may be validly trademarked, copyrighted or patented.

2.     Restrictions. Both Parties will make no attempt to ascertain the circuit diagrams, source code, schematics, logic diagrams, components, operation of, or otherwise attempt to decompile or reverse engineer any portion of the Partner IP. Except as specifically authorized in writing, both Parties may not copy any portion of the Partner IP, or modify or transfer the Partner IP, or any copy or merged portion thereof, in whole or in part, or prepare any derivative work of the Partner IP. To the extent that either party or its employees or contractors conceive, practice, develop or otherwise participate in the creation or development of technology related to the Partner IP, including any derivatives, improvements, enhancements or extensions of such technology, Payer, on behalf of itself and its employees and contractors, hereby assigns to both Parties all rights, title and interest, including (without limitation) all intellectual property rights, therein. The breach or threatened breach by either Party of any provision of this Section D will subject both that Party, to the immediate termination of all Party's rights hereunder, and the opposing Party shall be entitled to an injunction restraining such breach without limiting other remedies for such breach or threatened breach, including recovery of damages.

E.   Indemnification.

1.     Indemnification by Medac. Medac agrees to indemnify, defend and hold MedDirect harmless from and against any loss, claim, judgment, liability, damage, action or cause of action (including reasonable attorneys' fees and court costs) (collectively, "Losses") directly resulting from a third party claim that MedDirect's proper use of the Partner IP infringes or misappropriates a valid U.S. patent or copyright issued or registered prior to the Effective Date; provided, however, that Medac shall have no obligation to indemnify, defend or hold MedDirect harmless with respect to such third party claims unless MedDirect promptly notifies Medac in writing of the claim, allows Medac to exclusively control the defense of such claim, and cooperates with Medac in the defense of the claim or in any related settlement negotiations.

*RAS*                                                                                                   *CDV*

2.    **Indemnification by MedDirect.** MedDirect agrees to indemnify, defend and hold Medac harmless from and against any loss, claim, judgment, liability, damage, action or cause of action (including reasonable attorneys' fees and court costs) (collectively, "Losses") directly resulting from a third party claim that Medac's proper use of the Party IP infringes or misappropriates a valid U.S. patent or copyright issued or registered prior to the Effective Date; provided, however, that MedDirect shall have no obligation to indemnify, defend or hold Medac harmless with respect to such third party claims unless Medac promptly notifies MedDirect in writing of the claim, allows MedDirect to exclusively control the defense of such claim, and cooperates with MedDirect in the defense of the claim or in any related settlement negotiations.

F.    **Limitation of Liability.**

1.    **LIMITATION ON CUMULATIVE LIABILITY.** THE CUMULATIVE LIABILITY OF Medac TO MEDDIRECT (AND MEDDIRECT TO Medac) FOR ANY ACTUAL OR ALLEGED DAMAGES ARISING OUT OF, BASED ON OR RELATING TO THIS AGREEMENT, WHETHER BASED UPON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), WARRANTY OR ANY OTHER LEGAL THEORY, SHALL NOT EXCEED THE AMOUNT OF THE REVENUE SHARED UNDER THIS AGREEMENT BY MEDDIRECT AND Medac FOR OVER THREE MONTHS (3), THE MONTHLY AMOUNT TO BE AN AVERAGE CALCULATED USING THE PRECEDING MONTHS THAT THIS AGREEMENT HAS BEEN IN EFFECT.

2.    **LIMITATION ON SPECIFIED DAMAGES.** IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES (INCLUDING DAMAGES RELATED TO DELAYS, LOSS OF DATA, INTERRUPTION OF SERVICE OR LOSS OF BUSINESS OR PROFITS OR REVENUE), EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY THIRD PARTY CLAIM.

3.    **Assertion of Claims.** Any claim or cause of action arising out of, based on, or relating to this Agreement not presented to both Parties within one (1) year from the presentation of the claim or cause of action shall be deemed waived. Both parties shall have the duty to mitigate damages for which the opposite party may become responsible under this Agreement.

G.    **Miscellaneous.**

1.    **Compliance with Laws.** The parties shall comply with all applicable federal, state, local laws, and all rules, regulations, and statutes. Each party shall secure any license, permit, or authorization required by law in connection with this Agreement.

2.    **Notices.** Notices hereunder shall be in writing, signed by an officer of the notifying party, and delivered via facsimile, personally or sent by registered or certified mail, charges prepaid, or overnight courier service to the addresses noted in this Agreement (or to such other address as the recipient may have previously designated by written notice), and will be deemed given when so delivered or four days after the date of mailing, whichever occurs first, or upon electronic confirmation of delivery via facsimile transmission. All notices delivered to Medac should be sent with a copy to President, Medac, Inc., 804 Scott Nixon Memorial Drive, Augusta, GA 30907. In the case of MedDirect, notices should be sent to Greg VandenBosch, MedDirect, Inc., 3200 Broadmoor Avenue, S.E., Grand Rapids, MI 49512.

3.    **Assignment.** Either party shall not assign, sell or otherwise transfer this Agreement or any rights hereunder without the express prior written consent of the other party, which consent shall not be unreasonably withheld. An assignment hereunder shall be deemed to include the transfer of control of a majority equity ownership of party. Notwithstanding the foregoing, either party may terminate this Agreement in its sole discretion, if either party merges or consolidates with a competitor of the opposing party, effective immediately upon notice to that party. However, if Medac acquires or merges with another medical billing company that had a billing and collection function directed at Patient Balances similar to the services provided by MedDirect under this Agreement, Medac agrees to use its best efforts to introduce MedDirect's services to the other entity. Furthermore, any purported assignment or transfer in violation of this section shall be null and void, and shall entitle either party to terminate this Agreement effective immediately upon notice to opposing party. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.    **Third Parties.** No party that is not a party to this Agreement shall have any rights, claims or causes of action against either of the Parties based on the terms of the Agreement, and the Parties specifically agree that the Agreement does not grant any third party any right, claim or cause of action against either of the Parties. The Parties further agree that the entirety of their obligations to each other with regard to the services contemplated in the Agreement are set forth herein, and neither Party shall be liable to the other based on terms of agreements with third parties, including, but not limited to, Medac clients.

5.    **Force Majeure.** Except for either party's payment obligations hereunder, neither party shall be responsible for delays or failures in performance resulting from acts or events beyond its reasonable control, including but not limited to, acts of nature, governmental actions, fire, labor difficulties or shortages, civil disturbances, transportation problems, interruptions of power, supply or communications or natural disasters, provided such party takes reasonable efforts to minimize the effect of such acts or events.

6.    **Entire Agreement/Severability.** No representations have been made to induce either party to enter into this Agreement except for the representations explicitly stated in this Agreement. This Agreement supersedes all prior or contemporaneous written or oral agreements or expressions of intent or understanding and is the entire agreement between the parties with respect to its subject matter. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions will nevertheless

continue in full force without being impaired or invalidated in any way. The invalid, void or unenforceable provisions shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to this Agreement to the extent possible, unless such modification would materially alter the original intent of this Agreement. All terms, conditions or provisions which may appear on any purchase or sales order or invoice issued pursuant to this Agreement, to the extent inconsistent with the terms and conditions of this Agreement, shall be of no force or effect, notwithstanding the fact that such order or invoice may have been executed subsequent to the date of this Agreement, and, in any event, preprinted terms of any such order or invoice shall have no force or effect.

7.   **Amendment.** This Agreement cannot be terminated (other than as set forth herein) or changed except pursuant to a writing signed by an authorized officer of Medac and an authorized officer of MedDirect. No waiver of any of the provisions of this Agreement shall be effective unless in writing and signed by an authorized officer of the party charged with such waiver and any such waiver shall be strictly limited to the terms of such writing.

8.   **Costs.** Except as expressly set forth herein, each party shall bear its own costs, expenses, taxes and other charges whatsoever incurred in connection with the execution and performance of this Agreement.

9.   **Announcements.** All media releases, public announcements or other public disclosures by either Party or its employees or agents relating to this Agreement or its subject matter, including without limitation, promotional or marketing materials, shall be coordinated with and approved by an officer of MedDirect and officer of Medac prior to release, but this restriction shall not apply to any disclosure solely for internal distribution by either party or any disclosure required by legal, accounting or regulatory requirements.

10.   **Headings.** The section headings of this Agreement are inserted for reference and convenience purposes only and do not constitute a part, nor shall affect the meaning or interpretation of, this Agreement.

11.   **Copies.** This Agreement shall be executed in one or more counterparts, each of which is to be treated as an original.

12.   **Use of Names and Logos.** Except as otherwise permitted in this Agreement, neither Party shall use the other's name, logo or corporate identity for any purpose without the prior written consent of the Party whose name, logo or corporate identity is to be used.

13.   **Governing Law.** This Agreement shall be governed by, construed and enforced in accordance with, the laws of the State of Michigan.

**SECTION 2 – OBLIGATIONS OF MEDAC.**

Pursuant to this Agreement, Medac agrees to the following:

1.   Medac shall notify MedDirect on an interval of three (3) time per weeks by means of an agreed upon electronic submission method Accounts that Medac identifies as a Patient Balance.

2.   Subsequent to providing MedDirect with the Patient Balance information specified, Medac shall not be responsible for (a) negotiating with patients, guarantors or their representatives, and the relevant individuals within the Group, with regard to the Patient Balance; (b) communicating with patients, guarantors or their representatives, other than to direct them to MedDirect; (c) preparing any requisite documentation to preserve the Group's claim in light of judicial, regulatory, estate or administrative proceedings pertaining to the patient or guarantor that in any manner effect the Patient Balance; or (d) advising MedDirect on the processing of the subject Patient Balance, other than to explain its basis for determining that the referenced amount is to be paid by the patient or guarantor.

3.   In the event that MedDirect determines through its servicing of a Patient Balance in accordance with this Agreement that a Third Party Payor is potentially responsible in part or whole for what was initially determined to be a Patient Balance, and notifies Medac of same in accordance, Medac shall review the subject claim to determine if any portion thereof is a Patient Balance.

4.   If, following its review of the subject claim, Medac determines that the identified portion of the claim in question is, in fact, a Patient Balance, Medac will notify MedDirect of same, and provide supporting documentation for its position upon request, within a commercially reasonable time frame. Thereafter, MedDirect shall be responsible for servicing that portion of the claim that is determined by Medac to be a Patient Balance in accordance with the Agreement.

5.   Medac agrees to hold MedDirect harmless for any and all damages, including interest and attorneys' fees and costs, that Medac may incur as a result of its and/or the Group's inability to collect from a Third Party Payor any amounts that were initially placed with MedDirect as a Patient Balance due to issues related to the timely filing of claims with the Third Party Payor(s).

6.   In the event that Medac receives any payment on behalf of the Group for amounts that are readily determined to be Patient Balances transferred to MedDirect, Medac shall forward said payments to MedDirect for further handling.

SECTION 3 -- OBLIGATIONS OF MEDDIRECT.

Pursuant to the Agreement, MedDirect agrees to the following:

1.   Upon receipt of the Patient Balance Information from Medac in accordance, MedDirect shall assume sole and exclusive responsibility for the servicing of the Patient Balance in a commercially reasonable manner, in accordance with all applicable federal and state regulations, guidelines and statutes.

2.   Notwithstanding any provision to the contrary in Section 1, Subsections E and/or F, pertaining to indemnification and limitation of liability, respectively, MedDirect agrees to hold Medac harmless for any and all damages, including interest and attorneys' fees and costs that Medac may incur as a result of MedDirect's servicing of Patient Balances.

. 3.   In the event that MedDirect receives information regarding the purported Patient Balance during the course of servicing that a Third Party Payor may be responsible for payment of part or whole of the subject balance, MedDirect shall immediately forward to Medac and Medac will notify MedDirect regarding canceling of the account placed in a mutually agreeable manner.

4.   No less often than once per week, MedDirect shall (a) provide a payment report to Medac outlining the total amount received by MedDirect in connection with all of the Patient Balances that it is currently servicing and remit to Medac any and all amounts currently due and payable pursuant to the Fee Schedule.

5.   MedDirect shall transfer to Medac the responsibility for servicing any and all Patient Balances that remain unpaid for more than one hundred and twenty-one (121) days after the transfer of the Patient Balance to MedDirect for servicing; provided, however, that if MedDirect enters into a payment arrangement or a loan agreement with the relevant patient or guarantor, MedDirect shall only transfer such Patient Balance to Medac if and when a scheduled and agreed-upon payment pursuant to the subject payment arrangement or loan agreement is more than ninety (90) days overdue.

6.   MedDirect shall transfer to Medac the responsibility for servicing any and all Patient Balances recalled by Medac.

SECTION 4 -- EXCLUSIVITY.

1.   MedDirect agrees that during the effective term of this Agreement, it shall not provide the same or similar services to any other third party billing entity that provides billing services to healthcare providers specializing in the field of anesthesia medicine and pain management. Any exceptions that MedDirect may wish for Medac to make to this exclusivity provision are to be submitted in writing to the President of Medac for consideration and any exception that Medac is willing to make will be transmitted to MedDirect within fifteen (15) days of Medac's receipt of the request for an exception.

2.   If MedDirect terminates this Agreement without cause, MedDirect agrees that the exclusivity provision will remain in full force and effect for twelve (12) months following the effective date of the termination. If Medac terminates this agreement under the provisions of Section 1, Subsection B 2(a), MedDirect agrees that the exclusivity provision will remain in full force and effect for twelve (12) months following the effective date of the termination.

SECTION 5 -- NON-SOLICITATION AND NON-COMPETITION

1.   During the effective term of this Agreement, and for a twenty-four (24) month period following the termination of the Agreement for any reason, MedDirect agrees that it will not solicit or indirectly assist any other entity to solicit or otherwise induce any Group to cease doing business with Medac or to directly contract with MedDirect for the same or similar services provided by MedDirect under the auspices of this Agreement. Any breach of this provision by MedDirect would cause immediate and potentially irreparable harm to Medac's interests and Medac has the right to seek a restraining order in an appropriate court and, if Medac is successful, MedDirect agrees to pay Medac's attorney's fees and all court costs associated with such an action.

SECTION 6 - IMPLEMENTATION.

1.   Commencing promptly after the Effective Date, Medac and MedDirect shall use commercially reasonable efforts to implement necessary items in accordance with Obligations of this Agreement in sections 2 and 3. Each party shall designate a project manager who will work with their counterpart to develop and agree upon the specific implementation plan and schedule which will include the projected date for the commencement of the use of the services identified in sections 2 and 3. During the implementation Phase, both Parties shall work in coordination to receive from and submit to test data and provide the technical support and training services as reasonably required to bring both Parties to a live status, and capable of performing obligations per sections 2 and 3.

IN WITNESS WHEREOF, the Parties hereto have hereunto set their respective hands and seals all as of the day and year above written. Agreed to:

Medac/ MedDirect Master Services Agreement
10-29-08v1                                                                                                      5

COVERED ENTITY:

MEDAC, INC.

By: Richard A. Snow

Its: General Counsel / Director of Operations

Signature:

Date: November 4, 2008

BUSINESS ASSOCIATE:

MEDDIRECT, INC.

By: Gregory VandenBosch

Its: President

Signature:

Date: 10-31-08

EXHIBIT A

Fee Schedule

The following fees shall apply with respect to all Accounts referred to MedDirect for servicing:

A fee of Medac's Client Specific Billing Rate less one percent (1.00%) will be applied to principal payments collected by MedDirect on all patient-pay accounts. For example, Medac charges Client A a billing fee of five percent (5.00%). MedDirect's billing fee for Client A will be four percent (4.00%) of all principal payments collected by MedDirect.

RAs

ØρV

EXHIBIT B

HIPAA BUSINESS ASSOCIATE ADDENDUM

*october*   THIS HIPAA BUSINESS ASSOCIATE ADDENDUM (the "Addendum") is entered into effective as of the   *31st*   day of Michigan   49512   and   *Medda, Inc*   [GROUP]   ["COVERED ENTITY"] with a mailing address of *804 Scott Nixon Memorial Dr, Augusta GA 30907* and is attached to and made a part of the Payment Services Agreement (the "Agreement") entered into of even date herewith by and between Group and MEDDIRECT

RECITALS:

WHEREAS, pursuant to this relationship, BUSINESS ASSOCIATE acknowledges that COVERED ENTITY is subject to the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191, as a Covered Entity as defined in HIPAA and the implementing regulations promulgated by the U.S. Department of Health and Human Services and

WHEREAS, BUSINESS ASSOCIATE is a Business Associate of COVERED ENTITY as defined in HIPAA and the implementing regulations promulgated by the U.S. Department of Health and Human Services; and

WHEREAS, BUSINESS ASSOCIATE may receive certain information regarding past, present or future patients of COVERED ENTITY, (referred to herein as "PHI"). PHI shall mean individually identifiable Health Information (as that term is defined in 45 C.F.R. § 164.501) that is (i) transmitted by electronic media; (ii) maintained in any medium constituting electronic media; or (iii) transmitted or maintained in any other form or medium.

NOW THEREFORE, in consideration for limited use and access to PHI as permitted under HIPAA, BUSINESS ASSOCIATE and COVERED ENTITY hereby agree as follows:

1. Use of Protected Health Information. BUSINESS ASSOCIATE shall not, and shall ensure that its directors, officers, employees, contractors and agents do not, use PHI received from COVERED ENTITY in any manner that would constitute a violation of the privacy standards of HIPAA if used by COVERED ENTITY in such manner, except that BUSINESS ASSOCIATE may use PHI (i) for BUSINESS ASSOCIATE's proper management and administrative services, or (ii) to carry out the legal responsibilities of BUSINESS ASSOCIATE.

2. Disclosure of Protected Health Information. BUSINESS ASSOCIATE shall not, and shall ensure that its directors, officers, employees, contractors, and agents do not, disclose PHI received from COVERED ENTITY in any manner that would constitute a violation of the privacy standards if disclosed by COVERED ENTITY in such manner, except that BUSINESS ASSOCIATE may disclose PHI in a manner permitted pursuant to this Addendum or as required by law. To the extent BUSINESS ASSOCIATE in the course of performing its obligations under the Agreement discloses PHI to a third party, BUSINESS ASSOCIATE must

obtain, prior to making any such disclosure: (i) reasonable assurances from such third party that such PHI will be held confidential as provided in this Addendum, and will be disclosed only as required by law or for the purposes for which it was disclosed to such third party; and (ii) an agreement from such third party to immediately notify BUSINESS ASSOCIATE of any breaches of the confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

3. Safeguards Against Misuse of Information and Compliance with Other Laws. BUSINESS ASSOCIATE agrees that it will implement all appropriate, commercially reasonable safeguards to prevent the use or disclosure of PHI that are not permitted by the terms and conditions of the Agreement or this Addendum.

4. Need To Know and Access to PHI. BUSINESS ASSOCIATE may disclose PHI only to those of its employees, agents or subcontractors who need to know such information; provided that BUSINESS ASSOCIATE shall inform each such employee, agent or subcontractor of the confidential nature of the PHI and BUSINESS ASSOCIATE's obligations pursuant to this Addendum and further provided that each such employee, agent or subcontractor shall have agreed to the same restrictions and conditions placed upon BUSINESS ASSOCIATE by this Addendum. Business Associate shall take appropriate disciplinary action against any member of its workforce, whether employee, agent or subcontractor who uses or discloses PHI in contravention of this Addendum or the Agreement.

5. Effect of Termination of Agreement. Upon written request by COVERED ENTITY, completion of work by BUSINESS ASSOCIATE, or termination of the Agreement for any reason, BUSINESS ASSOCIATE shall return or destroy all PHI that it maintained in any form, recorded on any medium, or stored in any storage system, unless said information has been de-identified and is no longer PHI, and shall retain no copies of such PHI. BUSINESS ASSOCIATE shall remain bound by the provisions of this Addendum, even after termination of the Agreement, until such time as all PHI has been returned, de-identified or otherwise destroyed as provided in this Section.

6. Return or Destruction Infeasible. In the event BUSINESS ASSOCIATE determines that returning or destroying the PHI is infeasible, BUSINESS ASSOCIATE shall provide to COVERED ENTITY notification of the conditions that make return or destruction infeasible. Upon

B-1

determination by BUSINESS ASSOCIATE that return or destruction of PHI is infeasible, BUSINESS ASSOCIATE shall extend the protections of this Addendum to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as BUSINESS ASSOCIATE maintains such PHI.

7. **Reporting of Disclosures of Protected Health Information.** BUSINESS ASSOCIATE agrees to report to COVERED ENTITY, in writing, any use and/or disclosure of the PHI that is not permitted or required by this Addendum or the Agreement of which BUSINESS ASSOCIATE becomes aware. BUSINESS ASSOCIATE agrees that COVERED ENTITY may suffer serious and irreparable harm in the event BUSINESS ASSOCIATE uses or discloses the PHI to others in violation of this Addendum. BUSINESS ASSOCIATE expressly agrees that COVERED ENTITY may terminate the Agreement if COVERED ENTITY determines BUSINESS ASSOCIATE has violated a material term of this Addendum and may secure an appropriate legal remedy, including injunction or declaratory judgment, to enable COVERED ENTITY to protect its rights hereunder. In addition, COVERED ENTITY, at its option, may cure or end any breach or violation of this Addendum prior to or in lieu of terminating the Agreement, or may provide BUSINESS ASSOCIATE with an opportunity to cure such breach or violation.

8. **Documentation and Accounting of Disclosures.** Within ten (10) days of notice by COVERED ENTITY to BUSINESS ASSOCIATE that it has received a request for an accounting of disclosures of PHI regarding an individual during the six (6) years prior to the date on which the accounting was requested, BUSINESS ASSOCIATE shall make available to COVERED ENTITY such PHI as is in BUSINESS ASSOCIATE'S possession and is required for COVERED ENTITY to make the accounting required by 45 C.F.R. § 164.528. At a minimum, BUSINESS ASSOCIATE shall provide COVERED ENTITY with the following information: (i) the date of the disclosure; (ii) the name of the entity or person who received the PHI, and if known, the address of such entity or person; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure. In the event the request for an accounting is delivered directly to BUSINESS ASSOCIATE, BUSINESS ASSOCIATE shall forward such request to COVERED ENTITY. It shall be COVERED ENTITY'S responsibility to prepare and deliver any such accounting requested. BUSINESS ASSOCIATE hereby agrees to implement an appropriate record-keeping process to enable it to comply with the requirements of this Section.

9. **Access and Amendment of PHI.** BUSINESS ASSOCIATE shall make PHI available as provided in 45 C.F.R. §164.504 (e) (2) ii (E)-(F) for purposes of access and amendment within ten (10) days of receiving a request from COVERED ENTITY.

10. **Availability of Books and Records.** BUSINESS ASSOCIATE agrees to make available its books, records,

agreements, policies, and procedures relating to the use and/or disclosure of PHI received from, or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY to the Secretary of Health and Human Services for purposes of determining COVERED ENTITY's compliance with HIPAA, subject to attorney-client and other applicable legal privileges.

11. **Rights Cumulative.** All rights and remedies conferred under this Addendum or by any other instrument or law shall be cumulative, and may be exercised singularly or concurrently. Failure by COVERED ENTITY to enforce any provision of this Addendum shall not be deemed a waiver of future enforcement of that or any other provision. In the event that any portion of this Addendum shall be held to be unenforceable, the remaining portions of this Addendum shall remain in force and effect.

12. **Notices.** All notices required under this Addendum shall be in writing and shall be deemed to have been given on the next day by fax or other electronic means or upon personal delivery, or in ten (10) days upon delivery in the mail, first class, with postage prepaid. Notices shall be sent to the addressees indicated below unless written notification of change of address shall have been given.

If to COVERED ENTITY:
Medac, Inc.
811 Scott Nixon Memorial Drive
Augusta GA 30907
Attn: Chief Executive Officer

If to BUSINESS ASSOCIATE:
MedDirect, Inc.
3200 Broadmoor Avenue
Grand Rapids, Michigan 49512
Attn: Gregory VandenBosch

13. **Modification of Addendum.** Except as otherwise provided herein, this Addendum shall not be amended or modified, nor shall any waiver of any right hereunder be effective, unless set forth in a document executed by both parties.

14. **Successors and Assigns.** This Addendum and the Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns.

15. **Third-Party Rights.** The terms of this Addendum are not intended, nor should they be construed, to grant any rights to any parties other than BUSINESS ASSOCIATE and COVERED ENTITY.

16. **Electronic Transactions.** BUSINESS ASSOCIATE represents and warrants that to the extent it is transmitting HIPAA Transactions (as that term is defined in 45 C.F.R. § 160.103) for COVERED ENTITY, the format and structure of such transmissions shall be in compliance with the Transaction Standards of HIPAA, provided, it is COVERED ENTITY'S responsibility to ensure that

B-2

appropriate Code Sets are used in the coding of services and supplies.

17.  **Electronic Protected Health Information.**  The capitalized terms in this Section shall have the same meaning as the definitions found in the Security Rule at 45 C.F.R. Parts 160 and 164.  To the extent that BUSINESS ASSOCIATE creates, receives, maintains or transmits Electronic Protected Health Information on behalf of COVERED ENTITY on or after April 20, 2005, BUSINESS ASSOCIATE agrees to:

A.  Implement Administrative, Physical, and Technical Safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic Protected Health Information;

B.  Ensure that any agent, including a subcontractor, to whom it provides Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect it; and

C.  Report to COVERED ENTITY any Security Incident of which BUSINESS ASSOCIATE becomes aware.

18.  **Owner of PHI.**  Under no circumstances shall BUSINESS ASSOCIATE be deemed in any respect to be the owner of any PHI used or disclosed by or to BUSINESS ASSOCIATE pursuant to the terms of this Addendum or the Agreement.

19.  **Changes in Law.**  The parties agree to amend either the Agreement or this Addendum, as appropriate, to conform with any new or revised legislation, rules and regulations to which COVERED ENTITY is subject now or in the future including, without limitation, the Privacy Standards, Security Standards or Transactions Standards (collectively "Laws").  If within ninety (90) days of either party first providing written notice to the other of the need to amend the Agreement or Addendum to comply with Laws, the parties, acting in good faith, are i) unable to mutually agree upon and make amendments or alterations to the Agreement or Addendum to meet the requirements in question, or ii) alternatively, the parties determine in good faith that amendments or alterations to the requirements are not feasible, then either party may terminate the Agreement upon thirty (30) days prior written notice.

IN WITNESS WHEREOF, the parties have executed this Addendum effective as of the date first set forth above.

COVERED ENTITY:

_Medac, Inc._

By: _Richard A. Snow_

Its: _General Counsel_

Signature: _Richard A. Snow_

BUSINESS ASSOCIATE:

MEDDIRECT, INC.

By: Gregory Vandenbosch

Its: President

Signature:

Exhibit C
Implementation Schedule

It Is the Interest of both parties that the services for the Groups shall be implemented on the following schedule: 1 (one) team (as is designated by Medac) effective December 1, 2008; 2 (two) teams, effective January 1, 2009; and 2 teams, effective February 1, 2009, which collectively represents 100% of Medac's clients. If this schedule does not work or changes must reasonably be made, both parties agree to make appropriate revisions to ensure successful implementation.

*RAT*

*CDV*

Medac/ MedDirect Master Services Agreement

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-61165-Civ-Cohn/Seltzer

JAMES K. FIANO,

      Plaintiff,

v.

MEDDIRECT, INC.,

      Defendant.

_____/

**COUNTY OF**          )
                   )
**STATE OF MICHIGAN**   )

### Affidavit of Al Ott

    BEFORE ME, the undersigned duly authorized in the County and State aforesaid to administer oaths, personally appeared Al Ott, having been duly sworn, deposes and says:

1.     My name is Al Ott, and I am over 18 years of age and am competent to testify to the matters herein. I have personal knowledge of the facts recited in this affidavit.

2.     I am the Compliance Manager for Meddirect, Inc. which is a medical billing company located at 3200 Broadmoor SE, Grand Rapids, Michigan 49512.

3.     Meddirect, Inc. was hired to perform billing services and request payment of an amount allegedly due and owing by James K. Fiano on an Anesthesiology Consultants of Palm Beach medical bill.

4.     I have had the opportunity to review the account history notes associated with Mr. Fiano's Account No. 5858518 which serves as Meddirect's institutional memory regarding the account history of its accounts.

5.     On March 21, 2008, Anesthesiology Consultants of Palm Beach forwarded Mr. Fiano's account to Meddirect, Inc. for billing and recovery. By agreement with Anesthesiology Consultants of Palm Beach, the accounts forwarded by this client are not deemed in default and therefore are treated as billing accounts rather than past due collection accounts.

6. As such, Meddirect, Inc. does not identify itself as a "debt collector" as that term is defined under the federal Fair Debt Collection Practices Act.

7. Meddirect, Inc. maintains policies and procedures for the handling of accounts which are not in default as well as accounts that are in a defaulted status. Any accounts that are not in default, are treated as pre-collection accounts and the account representatives do not identify themselves as debt collectors.

Al Ott
Compliance Manager
Meddirect, Inc.

Subscribed and sworn to before me
this _19_ day of _March_, 2009.

TERESA HEINZ HOSKING
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires JAN. 20, 2013
Acting in the County of Ingham

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-61165-Civ-Cohn/Seltzer

JAMES K. FIANO,

     Plaintiff,

v.

MEDDIRECT, INC.,

     Defendant.

_____ /

COUNTY OF RICHMOND)
                     )
STATE OF GEORIGA   )

### Affidavit of Rick Snow

    BEFORE ME, the undersigned duly authorized in the County of State aforesaid to administer oaths, personally appeared Rick Snow, having been duly sworn, deposes and says:

1. My name is Rick Snow, and I am over 18 years of age and am competent to testify to the matters herein.  I have personal knowledge of the facts recited in this affidavit.

2. I am the Senior Vice President of Legal Affairs and General Counsel for Medac, Inc., agent for Anesthesiology Consultants of the Palm Beaches, P.A., which is a medical healthcare provider.

3. Meddirect, Inc. was hired to perform billing services and request payment of an amount allegedly due and owing by James K. Fiano on an Anesthesiology Consultants of the Palm Beaches medical bill.

4. I have had the opportunity to review the account history notes associated with Mr. Fiano's Account No. 5858518. The subject account was not considered in default at the time that the account was sent to Meddirect nor at anytime in which Meddirect attempted to communicate with Mr. Fiano.

5. On March 21, 2008, Anesthesiology Consultants of the Palm Beaches through its agent Medac, Inc. forwarded Mr. Fiano's account to Meddirect, Inc. for billing and recovery. By agreement with Anesthesiology Consultants of the Palm Beaches, the accounts forwarded by our organization are not deemed in default and therefore are treated as billing accounts rather than past due collection accounts.

Rick Snow
**Senior Vice President of Legal Affairs and General Counsel Medac, Inc., Agent for Anesthesiology Consultants of the Palm Beaches, P.A.**

Subscribed and sworn to before me this _19th_ day of _March,_ 2010.

Expires 10/09/11